504 So.2d 82 (1987)
Judy M. FOSTER, et vir., Plaintiff-Appellee,
v.
LAFAYETTE INSURANCE COMPANY, et al., Defendants-Appellees,
J.T. Ferrier, et al., Defendants-Appellants.
No. 18411-CA.
Court of Appeal of Louisiana, Second Circuit.
February 25, 1987.
Rehearing Denied March 25, 1987.
Writs Denied April 23, 1987.
*84 Hicks & Bookter by S. Maurice Hicks, Jr., Shreveport, for J.T. & Craig Ferrier.
Mayer, Smith & Roberts by Vicki C. Warner, Shreveport, for Valley Forge Ins. Co.
Bodenheimer, Jones, Klotz & Simmons by G.M. Bodenheimer & Mary L. Cook Blackley, Shreveport, for Casualty Reciprocal Exchange Ins. Co.
Donald R. Miller, APLC, Shreveport, for defendants-appellees.
Before MARVIN, SEXTON and NORRIS, JJ.
MARVIN, Judge.
From a $40,897 net judgment for personal injuries sustained when one of seven high school boys on a lark intentionally threw a rotten pumpkin, once used as a jack-o-lantern, from the rear of a southbound pickup through the windshield of a northbound pickup being driven by plaintiff Mrs. Foster on a Shreveport thoroughfare, four defendants appeal.
The defendants-appellants are the driver of the pickup, who became an adult after this action was instituted, the father of the driver, the UM carrier for Mr. and Mrs. Foster, and the UM carrier for the owner of the truck Mrs. Foster was driving.
Plaintiffs Mrs. Foster and her husband, who was a passenger in the pickup she was driving, also appeal, seeking to increase the award to her and to have this court award damages to him for his injury and for his loss of consortium. The liability issues are factually and legally related. The UM carriers contend that the intentional throwing of the pumpkin by 17-year-old Scott Drach from the rear of the truck driven by 17 year old Craig Ferrier did not arise out of the ownership, maintenance, or use of Ferrier pickup, which, under each UM carrier's policy, was an un- or under-insured vehicle.[1]
Craig Ferrier and his father contend that Craig did not factually or legally contribute to the throwing of the pumpkin and was not negligent in any respect. The UM carriers track the Ferriers' argument by alternatively contending Craig Ferrier's vicarious liability, if any, that might conceivably result from his being engaged in an enterprise with, or on a lark with, Scott Drach and the other boys, did not arise from, and was not caused by, the operation or use of the Ferrier pickup.
The trial court reasoned that Craig Ferrier and his passengers were acting in concert and found all defendants liable in solido. Mrs. Foster's award was itemized below as $75,000 damages, $5,595.73 medical expenses, and $1,200 loss of wages. The trial court reduced the total damages by one-half because Mrs. Foster settled her demands against Scott Drach, his parents, and their homeowner's insurer. See La. C.C. Art. 1803; Garrick v. Washington Parish, 440 So.2d 787 (La.App. 1st Cir. 1983).
We amend and affirm.

*85 FACTS
In the early evening of November 3, 1983, Craig Ferrier and six other Woodlawn High School students about the same age began cruising the Woodlawn-Southwood High School contiguous school districts in the Ferrier pickup. The rivalry between these schools is described as intense. This was the eve of the date for the Woodlawn-Southwood football game. When these boys drove in the immediate area of Southwood, students there pelted them with raw eggs and balloons filled with water. Ferrier and his friends attempted to steal a road construction warning light in the area and had a confrontation with other boys, during which a tire tool and a knife were exhibited.
After departing, one or more of the Ferrier group purchased from a convenience store at which they stopped, several cans of biscuits, the contents of which were thrown from the Ferrier pickup at other vehicles when the Ferrier pickup resumed its cruise. At a trash bin at another location, Craig Ferrier stopped to allow one or more of his passengers to obtain oyster shells which were intended to be thrown from the Ferrier pickup. While Craig Ferrier continued cruising, one of the boys in the rear of the truck saw the discarded and rotting jack-o-lantern. At the order or request of one or more of his passengers, Craig Ferrier stopped his truck to allow the pumpkin to be put in the truck, obviously, we deduce, for the purpose of also being thrown from the truck.
About 7:30 p.m. Mrs. Foster, with her husband as passenger, was driving her son's pickup north on Linwood Avenue. At this time four boys were in the rear and two others were in the cab of the truck being driven by Craig Ferrier south on Linwood. Scott Drach, one of the boys in the back of the truck, picked up the pumpkin and threw it at the windshield of the Foster pickup as it approached the Ferrier pickup. The impact shattered the windshield on the Foster truck in the face of Mr. and Mrs. Foster. Mrs. Foster sustained serious injuries which will be later considered. Craig Ferrier admitted leaving the scene of the accident by an "evasive" route to avoid police.

CRAIG FERRIER'S NEGLECT
Negligence, of course, must arise out of the breach of a duty owed by a defendant to a particular plaintiff. Unless some conduct or omission on the part of Craig Ferrier is found to have contributed substantially to the cause-in-fact of the injuries to plaintiffs, we need not further inquire into what duty, if any, of Craig Ferrier protected these plaintiffs against what risks.

CAUSE-IN-FACT
Without further elaboration, we readily conclude that but for the chauffeuring of the others by Craig Ferrier and his stopping to allow the pumpkin to be placed in the truck when he knew or should have known that his passengers had been and were throwing objects from the truck at other persons and vehicular traffic, the pumpkin would not have been thrown. Craig Ferrier's conduct was a substantial cause in fact of the injuries to Mr. and Mrs. Foster.

LEGAL CAUSE
Certainly Craig Ferrier owed to others on or about the roadway the duty of reasonably operating, controlling, and using his automobile. To all, he owed the duty of being reasonably observant of conditions that either might affect the operation or use of his vehicle that would pose an unreasonable risk of harm to others. See LRS Title 32, Motor Vehicle Law; La. C.C. Art. 2315. Stated in another way, a person in control of a motor vehicle must make a reasonable effort to avoid that vehicle or any object in, on, or from that vehicle from causing injury to others on or about the highway. C.C. Art. 2315.
We have noted that the most exasperating and elusive torts problem that a judge must face is the task of determining how far legal protection should extend. Rules are essentially condemned. Reasoned and careful analysis is preferred. *86 Foreseeability is not the only criterion for determining whether there is a duty-risk relationship. Because a risk may foreseeably arise out of certain conduct or omission does not necessarily place that risk with the scope of the duty owed. Neither are all non-foreseeable risks excluded. Inquiry must be made into the ease of associating the injury with the duty that is sought to be enforced against the defendant and into policy reasons that serve to indicate how far, or to what extent, the duty should extend.
Where the rule of law imposing the duty derives from a principle such as is found in C.C. Art. 2315 that the Legislature has left to the courts to implement, we exercise our own judgment, much like the Legislature might exercise, in weighing policy reasons for and against imposing and enforcing the duty to the extent that is sought. Finley v. North Assur. Co. of America, 476 So.2d 837, 843-846 (La.App. 2d Cir.1985), and authorities cited therein. There we quoted with approval:
The keys for the solution of the issue of responsibility when there is more than one cause-in-fact of damages are (1) a determination of the exact risk or risks anticipated by imposition of the legal duty which has been breached and (2) the legal or policy considerations which grant excuses from certain consequences which follow an act of negligence. This requires ... a jurisprudential determination which will implement and make effective our broad codal provisions concerning those who should respond in damages for their fault. (Emphasis added.) Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821, 831 (1970).
We agree with the trial court's express and implied conclusion that Craig Ferrier breached his duty of reasonable care toward others on or about the roadway by actively participating in the lark or undertaking with his passengers, chauffeuring them, stopping to allow procurement of items which could be, and which were, thrown from the truck. We simply cannot find, and have not heard suggested, any legal or policy reasons that might excuse the consequences of Craig Ferrier's conduct.
As the chauffeur of the group and fully aware of the mission and purpose of the group and that the group was procuring and purchasing items which were being thrown from his truck, Craig Ferrier could have easily thwarted or aborted the undertaking. The obvious risk that someone on or about the roadway would suffer injury from an item being thrown from his truck is easily associated with the rule of this case:
Under the described circumstances, the custodian-driver's duty of reasonable care towards others on or about the roadway includes the duty of taking reasonable measures either to prevent his passengers from throwing objects from his truck at other vehicles or persons, or, at least, not actively assisting their efforts to procure the objects and find targets at which to throw the objects.
The consequences of Craig Ferrier's breach of his duty is not excused by the explanation that no one expected, anticipated, or reasonably foresaw that a pumpkin, either rotten or in a rotting condition and once used as a jack-o-lantern, would do more than squash or shatter when thrown from a moving vehicle onto or against another moving vehicle.

USE OR OPERATION OF TRUCK
Similarly, we have no difficulty in finding that the relationship between the throwing of the pumpkin and the manner in which Craig Ferrier was using and operating his truck is so clearly connected and easily associated, not only factually, but legally, to support the ultimate conclusion that the UM policies of the defendant UM carriers are liable to the extent of their respective policy limits to Mr. and Mrs. Foster.
This conclusion is reached by the same analysis we have made above. Cause-infact is only the initial inquiry, but the resolution of the legal (proximate) cause and automobile use problems require policy inquiries. Blue v. State Farm Mut. Auto. *87 Ins. Co., 493 So.2d 701 (La.App. 2d Cir. 1986), writ denied, 496 So.2d 1041 (La. 1986), and authorities cited therein.
In Blue, we did not find that State Farm's liability or UM policies applied because Blue's injuries arose out of an altercation between Trooper Blue and the automobile driver Trooper Blue had stopped after each driver had exited each vehicle. The stopped driver intentionally attacked the Trooper with a ball-point pen.
Each case in this problematical area of tort law must be decided on its own facts and after careful analysis. Finley, supra.
Here we have no difficulty in concluding that the manner in which Craig Ferrier was using and operating his truck bears a significant and sufficient factual and legal connexity to the throwing of the pumpkin. If the pumpkin or any other object had fallen from, or had been negligently dropped from, the truck to cause injury to another, the ease of associating the use of the truck with the injury would be more apparent. Where it is easily concluded that Craig Ferrier actively participated in the mission of the group as described above and had stopped the truck to obtain the pumpkin and knew that his group had been and were throwing objects from his truck, it does not strain reason or credulity to reach the same conclusion. The specific duty breached by Craig Ferrier, that is, his failure to take reasonable measures to prevent his passengers from throwing objects from his truck at others, "flowed" from the manner in which he was using or operating the truck. See Fertitta v. Palmer, 252 La. 336, 211 So.2d 282 (1968); Carter v. City Parish Government, 423 So.2d 1080 (La. 1982); McKenzie, Automobile Liability InsuranceUse, 44 La.L.Rev. 365, 368 (1983).

QUANTUM
Defendants contend that the damages awarded Mrs. Foster are excessive and should be reduced. Plaintiffs seek to increase the award to Mrs. Foster and have this court make an award to Mr. Foster for his damages and loss of consortium. The trial court awarded Mrs. Foster damages of $75,000 for the permanent injury to her eyes, facial pain and suffering, and loss of earning capacity without further itemization.
Before a court of appeal can disturb an award made by a trial court, the record must reveal that the trier of fact has clearly abused its discretion. The award is then "disturbed" only to the extent of lowering it (or raising it) to the highest (or lowest) point as the case may be, to an amount that is found to be within the reasonable discretion or range afforded a trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). See also Reck v. Stevens, 373 So.2d 498 (La.1979).
Judy Foster is a 41-year-old female. She resides with her husband and has four children. She was employed by a sandwich company, where she earned a net income of approximately $130 a week. Her treating physician on the night of the accident, Dr. Byrd, testified that plaintiff had small pieces of glass in her eyes and suffered abrasions to both eyes and had a "through and through" laceration of the cornea in the left eye. Mrs. Foster underwent surgery that night to repair the lacerated cornea. She remained in the hospital for three days and was confined to bed for about a week after returning home. Dr. Byrd found her vision on discharge was 20/200, later improving to normal 20/20 with glasses. Dr. Byrd stated that the wound healed normally and that the only permanent visual problem she will have is glare sensitivity because of scar tissue on the cornea of the left eye and abrasions on her right eye. Dr. Byrd testified that when he released Mrs. Foster from his care, he placed no restrictions on her activities. Mrs. Foster also suffered lacerations over various parts of her face. The trial court observed minor scars on her lip and above her eye as a result of these abrasions.
Mrs. Foster went back to work on January 16, 1984, some 2½ months after the accident and performed her normal work duties. She was awarded $1,200 for this time off work. Mrs. Foster quit her job several months later, complaining that the *88 sun was bothering her eyes and causing her headaches. She also complained of difficulty sleeping on her left side.
The trial court included loss of earning capacity as an element of the $75,000 damage award but did not otherwise itemize the award. Mrs. Foster will have permanent sensitivity in her eyes due to sunlight or light glare. This impairment obviously affects her earning capacity and entitles her to some award. Ward v. La. & Ark. Ry. Co., 451 So.2d 597 (La.App. 2d Cir. 1984). Compare Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La. 1983).
When we consider Mrs. Foster's serious injuries, her residual scarring, and her residual sensitivity to light and resulting impairment, however slight, against the $75,000 award made by the trial court, we cannot say that the award is too high, as defendants contend, or too low, as plaintiffs contend, so as to constitute an abuse of the discretion afforded the trial court.
In the light of Mrs. Foster's personal, family, and working history, and her lifestyle, before and after her injuries, we can only conclude that the trial court achieved substantial justice in assessing the $75,000 damage award (for pain, suffering, permanent injury, and impairment of earning capacity) and did not abuse its discretion. As to Mrs. Foster, in all respects, we shall affirm.
We shall amend to allow damages to Mr. Foster. In his brief he states that "when the pumpkin exploded into the windshield, fragments of glass struck him. He needed no medical attention, but did receive pieces of glass about his person. He ... was very worried about his wife and was concerned that she would lose her eyesight." In his specifications of error in this court, Mr. Foster seeks not only damages for the trauma he suffered, but for loss of consortium. He did not seek to prove the elements of loss of consortium in the trial court. Compare Johnmeyer v. Creel, 499 So.2d 571, 576 (La.App. 2d Cir.1986); Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986). For the shock and trauma he sustained when the pumpkin shattered the glass on him, we consider $350 to be reasonably fair and just.
Plaintiffs also complain that the award should not have been reduced by one-half simply because they settled their demands with the Drach defendants. Their argument does not convince us. Likewise we find no merit in plaintiffs' argument that penalties and attorney fees should be assessed against each UM carrier for contesting its liability under this problematical area.

DECREE
We amend the judgment to include an award in favor of plaintiff Deryl Foster for $350, subject to the provisions and conditions of the judgment appealed, that is to reduce that award by one-half, or to $175, and to limit the effect of the judgment to the extent of the policy limits of each UM defendant. As thus amended, and at the cost of defendants-appellants, the judgment, in all other respects, is AFFIRMED.
NOTES
[1] Each UM carrier's policy required that the insured bodily injury arise out of the ownership, maintenance, or use of the UM vehicle (here the Ferrier pickup). The Ferrier pickup had only $5,000/$10,000 liability coverage. The pickup being driven by Mrs. Foster had $10,000 UM coverage. The vehicle owned by Mr. and Mrs. Foster had $25,000 UM coverage.